UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TROY BJUGAN and ASHLI BJUGAN, | No. 3:12-cv-01423-HU |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| STATE FARM FIRE AND CASUALTY COMPANY, | |
| Defendant. | |

Robert E.L. Bonaparte
Email: bob@bb-law.net
Shenker & Bonaparte, LLP
1500 SW 1st Avenue, Suite 765
Portland, OR 97201
Telephone: (503) 242-0008
Facsimile: (503) 323-7360

    Attorney for Plaintiffs

Douglas F. Foley
Email: doug.foley@dougfoleylaw.com
Douglas Foley & Associates, PLLC
13115 N.E. 4th Street, Suite 260
Vancouver, WA 98684
Telephone: (360) 883-0636
Facsimile: (360) 944-6808

    Attorney for Defendant

Page 1 - OPINION AND ORDER

HUBEL, Magistrate Judge:

    This case involves a renter who "maintained," if that is the right word, ninety-five cats and two dogs in a rental house and the manner in which the animals were maintained resulted in physical damage to the house. The owner of the rental house seeks coverage under defendant's policy of insurance for the damage to the house. The defendant denies the damage is covered as it is identified in the policy as a "Loss Not Insured."

**Facts**

    Plaintiffs Troy and Ashli Bjugan (collectively, "the Bjugans") own a rental home located at 21516 SE Foster Road, Damascus, Oregon. Defendant State Farm Fire and Casualty Company ("State Farm") issued an insurance policy covering the Bjugans' rental home. The policy states that State Farm "insure[s] for accidental direct physical loss to the property described in Coverage A and B, except as provided in Section I — Losses Not Insured." (Bjugan Decl. Ex. 1 at 1.) The portion of the policy entitled "Section I — Losses Not Insured" provides, in relevant part: "[State Farm] do[es] not insure for loss to the property described in Coverage A and B either consisting of, or directly and immediately caused by . . . birds, vermin, rodents, insects or *domestic animals*." (Bjugan Decl. Ex. 1 at 1) (emphasis added).

    In late October 2011, the Clackamas County Sheriff's Office ("CCSO") obtained a search warrant for the Bjugans' rental home, which was occupied at the time by Ronnie Sandberg ("Sandberg" or "the renter"), on the basis of complaints from area residents of animal neglect, firsthand observations and information provided by Damascus city officials. What they discovered in the ensuing

Page 2 - OPINION AND ORDER

search was described as "deplorable and unhealthy conditions." (Foley Decl. Ex. A at 8.)  Entering the home required the use of protective clothing and respirators because the interior walls and floors were covered with animal urine and feces. (Foley Decl. Ex. A at 8.)  The Oregon Humane Society ("OHS") ultimately removed ninety-five cats and two dogs from Sandberg's residence.  One dog was nearly blind from a chronic, painful dry eye condition while the other could barely use his hind legs; 30% of the cats were emaciated; 90% of the cats required medical attention or surgical intervention; and 30% of the cats had some type of ocular condition, ranging from ocular discharge to infections so severe that the cats' eye(s) had to be removed under anesthesia.

Not long afterwards, the Bjugans sought to recover the cost of repairing the damage caused by Sandberg from State Farm.  Relying on the provision in the insurance policy that excludes from coverage damage caused by "domestic animals," State Farm denied the Bjugans' claim.  The Bjugans then brought this diversity action against State Farm on August 7, 2012, alleging breach of their insurance policy and breach of the implied covenant of good faith and fair dealing.  State Farm and the Bjugans now move for summary judgment and partial summary judgment, respectively.

## Legal Standard

Summary judgment is appropriate "if pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Summary judgment is not proper if factual issues exist

Page 3 - OPINION AND ORDER

for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovick v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of plaintiff's positions [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

Page 4 - OPINION AND ORDER

(1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

### Oregon Insurance Law

Under Oregon law, the insureds (the Bjugans) have the burden to prove a loss comes within a coverage granted by the policy, while the insurer (State Farm) has the burden to prove a loss is within an exclusion of the policy. *ZRZ Realty Co. v. Beneficial Fire & Cas. Ins. Co.*, 349 Or. 117, 127 (2010); *Stanford v. Am. Guaranty Life Ins. Co.*, 280 Or. 525, 527 (1977) (insurer has the burden to prove an exclusion); *Lewis v. Aetna Ins. Co.*, 264 Or. 314, 316 (1973) (insured has the burden to prove coverage).

The question of insurance policy interpretation is one of law, and the court's "task is to determine the intent of the parties." *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or. 303, 307 (1999) (citation omitted); *see also Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992) ("[T]he primary and governing rule of the construction of insurance contracts is to ascertain the intention of the parties.") (internal quotation omitted). The court determines the parties' intent "from the terms and conditions of the policy." *Groshong*, 329 Or. at 307.

A term is ambiguous if two or more plausible interpretations of that term withstand scrutiny, *i.e.*, continues to be reasonable after the interpretations are examined in the light of, among other things, the particular context in which that term is used in the

Page 5 - OPINION AND ORDER

policy and the broader context of the policy as a whole. *Hoffman*, 313 Or. at 470.

When the policy does not define the terms at issue, the court "resort[s] to various aids of interpretation to discern the parties' intended meaning." *Groshong*, 329 Or. at 307-08. The court first examines the plain meaning of the term at issue. *Id.* at 308. If the meaning of the term or phrase at issue is not plain on its face, the court proceeds to its second aid to interpretation: "examin[ing] the phrase in light of the particular context in which . . . [it] is used in the policy and the broader context of the policy as a whole." *Id.* at 312 (internal quotation marks omitted).

If, after application of such analysis, the court determines that the term is ambiguous, the court may then consider extrinsic evidence in interpreting the insurance contract. *See Mutual Ins. Co. v. Mitsubishi Silicon Am. Corp.*, 164 Or. App. 385, 397-98 (1999) (court may consider extrinsic evidence in interpreting an insurance contract only if it first finds the policy to be ambiguous). Finally, if there is no relevant extrinsic evidence to consider or the term remains ambiguous, the term is to be construed against the insurer, the party which drafted the policy. *Groshong*, 329 Or. at 312. As the *Hoffman* court explained:

> [W]hen two or more competing, plausible interpretations prove to be reasonable after all other methods for resolving the dispute over the meaning of particular words fail, then the rule of interpretation against the drafter of the language becomes applicable, because the ambiguity cannot be permitted to survive. It must be resolved.

*Id.* at 470-71.

Page 6 - OPINION AND ORDER

1  On the other hand, where the contract unambiguously expresses
2 the intent to provide coverage or to not provide coverage, the
3 contract language is controlling. *See Allstate Ins. Co. v. State*
4 *Farm Mutual Auto. Ins. Co.*, 67 Or. App. 623, 627 (1984) (where
5 contract language is unambiguous, courts will "apply those terms
6 and will not create coveraAugust 28, 2013ge where none was intended
7 by the contract.")

**Policy Terms**

The Bjugans' policy provides, in relevant part:

> SECTION I — Losses Insured
>
> We insure for accidental direct physical loss to the property described in Coverage A and Coverage B, except as provided in Section I — Losses Not Insured.
>
> SECTION I — Losses Not Insured
>
> 1. We do not insure for loss to the property described in Coverage A and Coverage B either consisting of, or directly and immediately caused by, one or more of the following:
>
>    . . . .
>
>    g. vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.
>
>    . . . .
>
>    n. birds, vermin, rodents, insects or domestic animals. We do cover the breakage of glass or safety glazing material which is party of the building, when caused by birds, vermin, rodents, insects or domestic animals.
>
>    However, we do insure for any ensuing loss from items a. through n., unless the loss is itself a Loss Not Insured by this Section.

(Bjugan Decl. Ex. 1 at 1.)

///

Page 7 - OPINION AND ORDER

**The Parties' Positions**

Summarized the Bjugans argue this is a vandalism loss covered by the policy and the Court should use the efficient proximate cause analysis to determine that the loss is covered by the policy and not excluded. State Farm argues the plain language of the policy makes it clear the loss is not insured as it was directly and immediately caused by domestic animals, namely cats.

The Bjugans have established uncontroverted facts that this was an accidental physical loss. The renter was not intentionally causing harm to the premises. While the renter did acknowledge she knew there were cats doing damage, she tried to prevent that whenever she was aware of it occurring. The problem, the Bjugans argue, was the renter took in so many cats she could not possibly attend to every one on a frequent enough basis to be sure no damage was done to the dwelling. There is no contention by State Farm here that this was not accidental damage in this sense. Indeed, it was State Farm's lawyer who established in deposition questioning that the renter had no intention to damage the premises.

This does not end the inquiry. It does shift the focus to the Losses Not Insured Section which is State Farm's burden to establish if it is to avoid coverage. State Farm argues that the language of item n. of Section I — Losses Not Insured applies to these facts and excludes this damage claim from coverage under the policy because this loss was caused directly and immediately by domestic animals, cats in this case. The Bjugans' response seems to be twofold: first, they argue the cats are not domestic animals; and second, they argue that the cats were not the direct and immediate cause of the loss. I take the second argument first.

1    In support of their second contention, the Bjugans argue that
2 the efficient proximate cause wasn't the cats, but instead was
3 vandalism that occurred while the house was occupied and therefore
4 is not a Loss Not Insured.  The Bjugans refer to the deposition
5 testimony of the renter occupying the house when the loss occurred.
6    This requires examination of how the policy defines vandalism.
7 While the policy attached to defense counsel's declaration purports
8 to be the entire policy, page 4 of 34 of Exhibit A to the Foley
9 Declaration contains definitions 7 through 11 at the top of the
10 page and part of what is likely definition 6. The rest of
11 definition 6 and definitions 1-5 are not present in this Exhibit or
12 anywhere else in the record.  The parties seem to agree that the
13 policy does not define vandalism.
14    I note that the policy does not define all the risks or causes
15 of property damage that are covered explicitly.  It defines them
16 broadly as "accidental direct physical loss to the property . . . ,
17 except as provided in Section I — Losses Not Insured." Vandalism
18 while the house is occupied, as in this case, is not listed as an
19 exception to coverage in Section I — Losses Not Insured.  So the
20 question facing the court in interpreting the policy is whether the
21 loss was caused directly and immediately by domestic animals,
22 vandalism or some other accidental direct physical loss on the
23 uncontroverted facts in the record.  The Bjugans frame the issue as
24 whether vandalism is the efficient proximate cause of the loss. The
25 policy's language, however, frames the issue in different terms.
26    Where there might be two or more causes of a loss, one of
27 which might be within the excluded losses in Section I — Losses Not
28 Insured, and one which is not identified there, the State Farm

Page 9 - OPINION AND ORDER

policy has three clauses that address whether there is or is not coverage for the loss. First, Section I — Losses Insured requires the loss be an accidental direct physical loss to property covered under the policy. As discussed above, this is the insured's burden, and on this record State Farm does not challenge the coverage claim on this basis.

Second, there are two clauses in Section I — Losses Not Insured that might apply. It begins with "[w]e do not insure for loss to the property described in Coverage A and Coverage B either consisting of, or directly and immediately caused by, one or more of the following [thirteen types of loss]." (Bjugan Decl. Ex. 1 at 1.) The modifier "directly and immediately caused" may be of some assistance in determining the parties' intention regarding the situation the Court is confronted with here where there might arguably be two causes of the loss.

The second clause which may help determine the partes' intent is at the end of Section I — Losses Not Insured. It reads: "However, we do insure for any ensuing loss from items a. through n., unless the loss is itself a Loss Not Insured by this Section." (Bjugan Decl. Ex. 1 at 1.) These latter two clauses must be interpreted by the Court.

First, I note that items a. through n. are of two types. Some are causes of a loss, and some are types of damage or loss that may or may not result in further physical loss of a type that may be described in a. through n. or may not be described there. For example, settling or cracking of a foundation is a physical loss and is described in subparagraph m. of Section I — Losses Not Insured. This settling or cracking might also cause additional

Page 10 - OPINION AND ORDER

direct physical loss by, for example, breaking a natural gas line resulting in a fire that consumes the entire building to the ground. In a situation like this, the damage from the fire is not itself a Loss Not Insured under Section I so it is therefore a covered loss despite the fact that it resulted from settling or cracking of the foundation which preceded the fire. This result flows from the language quoted from the policy at the end of Section I — Losses Not Insured. In adjusting the loss, the insurer may or may not be able to eliminate the cost of a new foundation due to the listing of cracking damage in Losses Not Insured in subparagraph m.

In this case, State Farm contends subparagraph n. applies as the damage was directly and immediately caused by domestic animals, cats here. Subparagraph n., unlike subparagraph m., does not describe a type of physical loss and a cause of physical loss. Domestic animals such as cats are capable of causing a physical loss, but are not capable of being the physical loss itself.

The Bjugans, on the other hand, characterize the physical loss here as vandalism. The Bjugans' insurance policy does not define vandalism. When "the term at issue is not defined in the policy, the next step is to look to the plain meaning of the term." *Farmers Ins. Exch. v. Crutchfield*, 200 Or. App. 146, 154 (2005) (citation omitted). "Vandalism" is defined as the "[w]illful or ignorant destruction of public or private property " Black's Law Dictionary 1692 (9th ed. 2009); Merriam Webster's Collegiate Dictionary 1306 (10th ed. 1997) (defining "vandalism" as the "willful or malicious destruction or defacement of public or private property.")

Vandalism was similarly defined in *Hatley v. Truck Insurance Exchange*, 261 Or. 606 (1971), where the insured's policy covered losses that were the direct result of vandalism or malicious mischief, which was specifically limited to damage caused by willful and malicious destruction of the covered property. *Id.* at 615. In affirming the trial court's denial of the insurance carrier's motion for a directed verdict, the *Hatley* court stated:

> [True,] directing water against the outside of a building is not as certain to cause serious damage as directly flooding the inside. Nevertheless, it is obvious that some damage to the grounds or the building would probably result if they were subjected to the full spray from the hose placed near the building at the bottom of the sloping area and left running for a protracted period. The likelihood of some damage was great enough to bring the case within the policy coverage.

*Id.* at 618-19.

In support of their position that Sandberg's (the renter) actions constituted vandalism, the Bjugans cite *Hatley* and emphasize the following testimony provided by Sandberg during her deposition:

> Q. [Ms. Sandberg,] [d]o you think there was a substantial certainty that by having a large number of cats in and around Mr. Bjugan's home that there was likely be damage to Mr. Bjugan's home from the cats?
>
> A. Yes.

(Sandberg Dep. 85:20-24, Nov. 21, 2012.) As State Farm notes, however, Sandberg also testified that she did not intend to damage the Bjugans' rental home:

> Q. Well, let me ask you this: Did you intend or want to have the cats damage anything in this house?
>
> A. No, I did not.

Page 12 - OPINION AND ORDER

```
Q.   Do you consider yourself to be a vandal or do you
     consider yourself to have vandalized this home?

A.   No.

Q.   Was your intent ever to see Mr. Bjugan's rental
     house be destroyed or damaged by cats?

A.   No.

Q.   When you saw the cats damaging something, did you
     try to take some measures to do something to try to
     either stop it, minimize it, or otherwise prevent
     it?

A.   Yes, I tried to stop it and prevent it and—I'm not
     that kind of person.
```

(Sandberg Dep. 83:15-84:3.)

Assuming without deciding that this characterization of the renter's conduct is in fact vandalism and covered under the policy, this vandalism did not ensue from the activity of the cats. The renter's "vandalism" preceded the cats causing the damage. For the damage caused directly and immediately by the cats to escape the exclusion from coverage, the language at the end of Section I — Losses Not Insured requires that the damage itself not be a Loss Not Insured. Clearly damage caused by cats is listed in this exclusionary section.

The Bjugans seem to recognize this as they avoid addressing this language at the end of Section I — Losses Not Insured. Instead, they focus on cases that address efficient proximate cause as a concept to determine whether one or the other of two potential causes should be considered the "cause of the loss" under an insurance policy.

For example, the Bjugans draw the Court's attention to the case of *Graff v. Allstate Insurance Co.*, 54 P.3d 1266 (Wash. Ct. App. 2002), *rev. denied*, 70 P.3d 964 (2003), in which the

Page 13 - OPINION AND ORDER

Washington Court of Appeals held that a tenant's operation of an indoor methamphetamine lab: (1) constituted vandalism because the tenant acted in conscious or intentional disregard of the rights of the landlord, and the resulting damage was almost a certainty; and (2) was the efficient proximate cause of the landlord's loss because it could "be said that vandalism, a covered peril, preceded the contamination, an excluded peril." *Graff*, 54 P.3d at 1269.

Similarly, in *Gowans v. Northwestern Pacific Indemnity Co.*, 260 Or. 618 (1971), the Oregon Supreme Court explained that it is a well-recognized principle of insurance law "that where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produces the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss." *Id.* at 621; *Naumes, Inc. v. Landmark Ins. Co.*, 119 Or. App. 79, 82 (1993) (stating that the "efficient proximate cause" of an insured's loss "is the active and efficient cause that sets in motion a train of events which bring about a result without the intervention of any force, starting and working actively and efficiently from a new and independent source." (quoting *Couch on Insurance 2d*, § 74:11 (Rev ed. 1983)).

First, *Gowans* is not a case looking at which of two causes was the efficient proximate cause, it is an interpretation of what the term "loss by theft" meant and whether it includes a reward posted and paid by the insured to recover his property is a "loss by theft." *Naumes* is a case involving a policy with different causation language from the State Farm policy here. The pertinent language from the insurance policy in *Naumes* provided:

Page 14 - OPINION AND ORDER

```
                         INSURING CLAUSE
     This   Policy   insures   all    real   and/or    personal
     property . . . of the Insured . . . against ALL RISKS OF
     DIRECT PHYSICAL LOSS OR DAMAGE . . . .

                         PERILS EXCLUDED
     3) Loss or damage caused by flood, surface waters, waves,
     tidal wave or tidal water, overflow of streams or other
     bodies of water or spray from any of the foregoing, all
     whether driven by wind or not.
```

*Naumes*, 119 Or. App. at 81-82 (quotation marks omitted; brackets deleted). The policy also included the following endorsement:

> CONCURRENT CAUSATION-EXCLUSION ENDORSEMENT
>
> THIS POLICY DOES NOT INSURE AGAINST LOSS CAUSED BY ANY OF THE FOLLOWING. HOWEVER, AN ENSUING LOSS NOT EXCLUDED OR EXCEPTED IN THIS POLICY IS COVERED.
>
> A. WEATHER CONDITIONS. HOWEVER, THIS EXCLUSION ONLY APPLIES IF WEATHER CONDITIONS CONTRIBUTE IN ANY WAY WITH A CAUSE OR EVENT EXCLUDED IN THE POLICY TO PRODUCE THE LOSS.

*Id.* at 81-82 (quotation marks omitted).

One key difference from the State Farm policy at issue today is the policy in *Naumes* did not use the term "caused directly and immediately" as State Farm's policy does. Instead, it simply says "cause" each time. Both policies insure all risks, and then have enumerated exclusions. However, by not using the "direct and immediate" language, the *Naumes* policy leaves "cause" subject to interpretation as the efficient proximate cause. That definition looks back to the cause that started a chain of events, whereas a "direct and immediate" cause looks back only to the closest cause in time. One could say a driver driving without a license who is involved in an accident "caused" it by driving without a license. Had he obeyed the law he would not have been driving that day. However, it is the actions of those involved in the accident on the

Page 15 - OPINION AND ORDER

road that are the direct and immediate cause of the collision. Taking the Bjugans' argument literally, was it the renter's decision to have cat number five or ten or fifteen or thirty-five that reached the point of being vandalism? What was the cat damage before that point in time? The plain meaning of the State Farm policy is that it was the actions of the cats that was the "direct and immediate" cause of the physical loss here, whether it was the first cat, the thirty-ninth, or the ninety-fifth cat.

Last, this resolution eliminates the need to decide if the hoarding of ninety-five cats on these facts is or is not vandalism. Assuming it is, vandalism is still not the direct and immediate cause of the loss for the reasons stated above. Put simply, the language of the State Farm policy eliminates the meaning argued for by the Bjugans and any ambiguity of the word "cause" by adding the words "directly and immediately" to describe the causes not covered.

The Bjugans' first argument—that the exclusion for damage caused directly and immediately by domestic animals does not apply because a significant percentage of the cats kept at the house by the renter were feral and not tame or friendly to humans—requires examination of the meaning of the term domestic animals under the State Farm policy.

As indicated above, the Court's task is to determine the intention of the parties for the meaning of this term. We start with the plain meaning of the words. The Court expects the parties intended to include the commonly found domestic animals within the definition, including dogs, cats, and any number of the usual house pets, as well as a broader class of domestic animals. There is

Page 16 - OPINION AND ORDER

nothing within the words themselves that implicates the temperament of the animal. Whether it enjoys humans, is indifferent to them and avoids them, or is openly hostile to them as in a vicious dog, all would appear to be included.

The text and context of the phrase also suggests nothing about the tameness of the animal, nor does it suggest that the propensity of the animal to enjoy human contact has anything to do with the exclusion. Rather, the animals included in item n. are the types of animals one might reasonably expect to be found in and around a dwelling such as the Bjugans', whether they were of a temperament that enjoyed human contact or not.

Looking to the dictionary, as both sides suggest, does not change the meaning noticeably. Webster's defines domestic animal as "any of various animals (as the horse, ox, sheep) which have been domesticated by man so as to live and breed in a tame condition — compare ferae naturae." Webster's Third New International Dictionary 671 (unabridged ed. 1993). Webster's defines ferae naturae as "wild by nature: not usually tamed — used of such animals as foxes and wild ducks in which at common law no one can claim absolute property." *Id.* at 837.

Again, a house cat, whether feral or warm and fuzzy is nothing like a fox and is domesticated by man. Consider what the National Geographic website has to say about domestic cats:

> Domestic cats, no matter their breed, are all members of one species. *Felis catus* has had a very long relationship with humans. Ancient Egyptians may have first domesticated cats as early as 4,000 years ago. Plentiful rodents probably drew wild felines to human communities. The cats' skill in killing them may have first earned the affectionate attention of humans. Early Egyptians worshipped a cat goddess and even mummified their beloved pets for their journey to the next

Page 17 - OPINION AND ORDER

world—accompanied by mummified mice! Cultures around the
world later adopted cats as their own companions.

National Geographic, http://animals.nationalgeographic.com/ (search "domestic cat"; then follow the first "domestic cat" hyperlink).

The only cases brought to the Court's attention that discuss the meaning of domestic animals lead to the conclusion that the term includes the so-called feral cats as well as those more accepting of human attention. Using as background a definition from Black's Law Dictionary, an Ohio court declined to differentiate between domestic dogs and stray dogs. *See City of Dayton v. Dye*, No. 9539, 1986 WL 12353, at *3 (Ohio Ct. App. 1986).

Thus, I conclude the meaning of the term domestic animals is not ambiguous. It includes domestic cats whether feral or completely comfortable with human contact. The record supports the conclusion that the cats are all of the same species and the policy's use of the term in context suggests no intent by the parties to exclude damage by cats enjoying the attention of humans, while covering damage caused by cats that do not.

## Conclusion

For the reasons stated, the Bjugans' motion (Docket No. 13) for partial summary judgment is DENIED and State Farm's motion (Docket No. 18) for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated this  28th  day of August, 2013.

/s/ Dennis J. Hubel
_____
DENNIS J. HUBEL
United States Magistrate Judge

Page 18 - OPINION AND ORDER